**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | 1:24-CR-6 |
| v. | The Hon. Leonie M. Brinkema |
| ERIC ANTHONY STOKES II, | Hearing: April 9, 2024 |
| *Defendant.* | |

**THE UNITED STATES' POSITION ON SENTENCING**

The United States of America, by undersigned counsel, submits its position on the sentencing of the defendant, Eric Anthony Stokes II. The defendant provided fentanyl pills to an individual attempting to overcome his drug addiction who overdosed and died as a result. The defendant was not deterred by that tragic outcome and instead continued his pervasive distribution efforts over a prolonged period of time. Accordingly, the United States and the defendant respectfully and jointly recommend that the Court impose a 120-month sentence.

**BACKGROUND AND PROCEDURAL HISTORY**

In May 2019, the defendant distributed a small quantity of fentanyl pills to decedent-1 that caused decedent-1 to overdose and die. Text messages found on decedent-1's phone show how the deal played out. On Thursday, May 16, 2019, decedent-1 texted the defendant to ask if he had eight pills for sale. ECF No. 9, Statement of Facts ¶ 2; PSR ¶ 11. The defendant responded that he had nine pills remaining in his supply and that each pill cost $35. Statement of Facts ¶ 2; PSR ¶ 11. When decedent-1 questioned why the pills cost that amount, the defendant explained they were "ox 30s" and further explained the pills were "the blue joints u cop all the time." Statement of Facts ¶ 2; PSR ¶ 11. After a brief negotiation, decedent-1 agreed to buy two pills for $70. Statement of Facts ¶ 3; PSR ¶ 12.

1

Decedent-1's cell-site data show that he traveled from his home, which he shared with his family, to the area near the defendant's home. Text messages further confirm that decedent-1 bought the pills from the defendant, with the defendant complaining that decedent-1's car stereo was too loud when he arrived near the defendant's house. Statement of Facts ¶ 4; PSR ¶ 13. Decedent-1 returned to his family home, and later the defendant asked decedent-1 if he was enjoying the pills. Statement of Facts ¶ 4; PSR ¶ 13. Decedent-1 responded that "My chin hitting my knees[,] my knees pressing the floor lmao." Statement of Facts ¶ 5; PSR ¶ 14.

Decedent-1 didn't emerge from his bedroom the following morning, Friday, May 17. Around 1 p.m., decedent-1's father decided to check on decedent-1. He was lying on his bed, cold and bleeding from his mouth, nose, eyes, and navel. He had foam around his mouth and nose. The family called 911, and a family member attempted CPR while waiting for first responders to arrive. But decedent-1 was pronounced dead at the scene. He was 21 years-old.

The Commonwealth of Virginia's Medical Examiner performed an autopsy and concluded that decedent-1's cause of death was mixed drug intoxication due to fentanyl, despropionyl fentanyl, and tramadol. Statement of Facts ¶ 7; PSR ¶ 16. The amount of fentanyl found in decedent-1's system was approximately twice the amount typically considered fatal. Statement of Facts ¶ 7; PSR ¶ 16. The amount of tramadol was several times less what is considered therapeutic use. Statement of Facts ¶ 7; PSR ¶ 16. Despropionyl fentanyl is both a precursor chemical used to manufacture fentanyl and a metabolite created when the human body processes fentanyl.

In statements to law enforcement, other family members described decedent-1's struggle with drug addiction. One family member told police that decedent-1 had been in a rehabilitation facility in 2015 for methamphetamine abuse and revealed that he had a history of opioid abuse.

That same family member explained that he found decedent-1 unconscious on two previous occasions and suspected an overdose in those cases. He also told the police that decedent-1's girlfriend overdosed and died in either 2017 or 2018.

The defendant's illegal and reckless fentanyl distribution continued following decedent-1's overdose. The defendant had a messy relationship with a co-conspirator. They sometimes worked in tandem, sometimes separately, and sometimes distributed drugs contrary to the direct instructions of the other. Regardless of the precise outline of their illegal conspiracy, the basic facts are not disputed. The defendant and the co-conspirator were heavy drug users themselves. Partly to fuel their own drug use and partly in order to make money, they sold fentanyl pills from a motel room in Dumfries, off of Route 1. PSR ¶¶ 23-25. Witnesses describe a constant flow of people buying fentanyl pills from the defendant and the co-conspirator and told law enforcement that they routinely bought fentanyl pills from them. PSR ¶ 23.

Important parts of the witness interviews are confirmed by objective evidence. Motel records show that the defendant and the co-conspirator lived at the motel for long periods of time, and records from electronic payment services show the flow of money to the defendant and the co-conspirator from the witnesses interviewed by law enforcement (*see* PSR ¶ 24, ¶¶ 26-27). At points, the defendant also distributed fentanyl pills to decedent-2, who was friends with the defendant in high school. Statement of Facts ¶ 9; PSR ¶ 18. Decedent-2 suffered two non-fatal overdoses in 2021. On both occasions, an individual drove decedent-2 to a local hospital where he was revived using Narcan. Decedent-2 suffered a fatal overdose on the evening of August 31/September 1, 2021. The defendant did not distribute the fatal dose of fentanyl pills to decedent-2.

3

At some juncture, the defendant and the co-conspirator relocated to a home in Woodbridge, where their heavy use of fentanyl pills continued. Another witness reports that, in March and February 2023, the witness began supplying the defendant with fentanyl pills on a daily or near daily basis. PSR ¶ 26. As reflected in the PSR, the defendant's drug use was particularly heavy during that period of time, and while the witness believes the defendant distributed at least some of the pills he provided to the defendant, the defendant and the co-conspirator were primarily trying to fund their drug abuse by stealing from retail stores, often hiding stolen goods in a baby stroller and selling them. *See, e.g.*, PSR ¶ 50. More broadly, the defendant reports a long history of drug abuse, dating back to middle school. PSR ¶ 73. In 2018, at approximately age 21, the defendant took a fentanyl pill for the first time, almost immediately experienced a suspected overdose himself, and over time became increasingly addicted (PSR ¶ 73), with his distribution efforts closely linked to his own drug habit.

In January 2024, the defendant waived indictment and pled guilty to a criminal information charging him with one count of distribution of fentanyl, in violation of 21 U.S.C. § 841. *See* ECF Nos. 3-5. As part of the plea agreement, the United States and the defendant agreed to a joint, non-binding sentencing recommendation of 120 months. *See* ECF No. 8, Plea Agreement ¶ 5.

## ARGUMENT

### I.    Sentencing Law and the Guidelines Calculation.

Although the Sentencing Guidelines are not mandatory (*see United States v. Booker*, 543 U.S. 220 (2005)), the court is required to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). After doing so, the court must consider the § 3553(a) sentencing factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the

4

sentence to reflect the seriousness of the offense, the need to provide adequate deterrence to criminal conduct, and the need to avoid unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a). Ultimately, the sentence must meet a standard of reasonableness. *See Gall*, 552 U.S. at 46 (citing *Booker*, 543 U.S. at 260-62).

The defendant's offense of conviction carries no mandatory minimum and a statutory maximum of 20 years in prison. *See* 21 U.S.C. § 841(b)(1)(C). Those statutory penalties stand in contrast to a separate offense in § 841(b), which provides for a 20-year mandatory minimum sentence and a statutory maximum of life in prison for distribution of schedule II controlled substances, including fentanyl, "if death or serious bodily injury results from the use of such substance." *Id.*

As to the Guidelines, the base offense level is 24, which applies when relevant conduct accounts for at least 40 grams but less than 160 grams of fentanyl. *See* U.S.S.G. § 2D1.1(8); PSR ¶ 34. The defendant should receive a three-level reduction for acceptance of responsibility, resulting in a total offense level of 21. PSR ¶¶ 41-43. The defendant is in criminal history category III, having four criminal history points based on separate one-point offenses for possession with intent to distribute marijuana; distribution of marijuana; a larceny conviction with sentencing pending; and a grand larceny conviction. *See* PSR ¶¶ 46-49, ¶¶ 51, 53. The Guidelines range is therefore 46-57 months. PSR ¶ 87.

The drug weight represents a conservative calculation of the weight provable by a preponderance of the evidence. This calculation can be challenging in any case that doesn't involve seized drugs, and that's especially true when evidence concerning drug weight depends partly on witnesses to whom a defendant distributed. In this case, the drug weight is derived from evidence outlined in ¶¶ 23-27 of the PSR. Pursuant to the information in ¶ 23, witness-1 reports

buying 10 fentanyl pills per week for three months, each month containing four weeks, resulting in approximately 120 pills. Based on an approximate weight of 30 mg per pill (a conservative estimate), the Probation Office calculated, and the parties agree, that the defendant is accountable for 3.6 grams of fentanyl. Pursuant to the information in ¶ 24, witness-2 reports buying between 20 and 30 fentanyl pills per day from the defendant over a four-year period. If accurate, that would result in the distribution of approximately 29,200 pills from the defendant. The better measure, we believe, is the amount of money transferred to the defendant from witness-2 via CashApp, which is approximately $9,500 during that period. Witness-2 explained that the cost initially was $20 per pill. Witness-2 recalls that the price dropped over time, but couldn't provide a comprehensive breakdown of how much was paid. Assuming a $5 price per pill and using the same basic calculations explained above, the amount of fentanyl attributable to the defendant under ¶ 24 is 60 grams. Pursuant to ¶ 25, and using the same method of calculation, the defendant should be held accountable for approximately 36 additional grams of fentanyl.

The defendant objects to inclusion of any drug weight based on the information contained in ¶ 26, contending that any distribution was *de minimis* because the defendant's drug use was particularly heavy at that point in time. While the United States believes the defendant almost certainly distributed at least *some* of the pills covered by ¶ 26, there is no question the defendant's drug use in 2023 was substantial and out of control and the United States cannot prove that any particular amount of those pills were distributed. Based on the calculations above, the United States agrees with the PSR's finding that the defendant should be held accountable for 99.6 grams of fentanyl, resulting in the base offense level contained in the presentence report. PSR ¶ 28.

Beyond the drug weight calculation required by § 2D1.1, §§ 5K2.0 and 5K2.1 justify either an upward departure or variance.[1] Among other things, § 5K2.0 supports an upward departure or variance based on factors that are either not considered in calculating the Guidelines range or are not adequately considered in calculating the Guidelines range. *See* U.S.S.G. § 5K2.0(a)(2). Section 5K2.1 provides that, "[i]f death resulted, the court may increase the sentence above the authorized guideline range." In this case, §§ 5K2.0 and 5K2.1 indicate what common sense dictates: that the drug weight attributable to the defendant is only a portion of his conduct and a sentence above the Guidelines range is appropriate because the Guidelines don't adequately reflect the full sweep of the defendant's bad acts. *See, e.g.*, *United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021) (affirming an upward variance in a fatal overdose case under § 5K2.1); *United States v. Valladares*, 2023 WL 6067128, at *12 (D. Md. Sept. 15, 2023) (imposing an upward departure based on death-resulting in an overdose case).

## II.   A sentence of 120 months is warranted based on all of the § 3553(a) factors.

Two components of the defendant's conduct justify a 120-month sentence consistent with § 3553(a). There is the fatal overdose, itself a very serious crime, and the natural and probable consequence of distributing fentanyl. And there is the defendant's longstanding, pervasive drug distribution, which made that tragic outcome increasingly likely.

Fentanyl is one of the most dangerous substances that's been introduced into our community in recent years. It's 50 times more potent than heroin and 100 times more potent than morphine.[2] It's one of the key reasons why the United States is currently in the midst of the

---

[1] A departure is "a deviation from the Guidelines range 'computed by examining the provisions of the Guidelines themselves,' while a variance is a deviation from the Guidelines range 'based on application of the other statutory factors in 18 U.S.C. § 3553(a).'" *United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021) (quoting *United States v. Cruz-Perez*, 567 F.3d 1142, 1146 (9th Cir. 2009)).

[2] *Opioid Overdoses*, Centers for Disease Control and Prevention,

worst overdose crisis in its history, with 106,699 total overdose deaths in 2021 and 107,941

overdose deaths in 2022.[3]  The vast majority of those overdose deaths are caused by opioids, and

the vast majority of opioid-related overdoses are in turn caused by fentanyl, with the CDC

estimating that it accounted for about 88 percent of opioid-related deaths in 2021.[4]  While the

official death toll for 2023 is pending, provisional numbers tabulated through October 2023

suggest the number will be similar to 2021 and 2022.[5]  This number is so large it's difficult to

grasp. To put it into context, the largest stadium in the United States has an official capacity of

107,601—340 people fewer than 2022's fatal overdose figure.

It's certainly true that the problem accelerated during the pandemic, but as the following

graphs indicate, drug overdoses, and fentanyl overdoses specifically, were already serious

problems facing the country, and our community, at the time of decedent-1's death[6]:



Figure 1. National Drug-Involved Overdose Deaths*,
Number Among All Ages, by Gender, 1999-2021

---

https://www.cdc.gov/drugoverdose/deaths/opioid-overdose.html (last visited: April 2, 2024)
  [3] Mark Stobbe, *Drug overdoses reach another record*, Associated Press, March 21, 2024, https://apnews.com/article/overdose-deaths-us-drugs-epidemic-cdc-e0dfd9d1ae140004af64186aa21774da (last visited: April 2, 2024).
  [4] *Opioid Overdoses*, Centers for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/deaths/opioid-overdose.html (last visited: April 2, 2024)
  [5] Stobbe, *Drug overdoses reach another record*.
  [6] *Drug Overdose Death Rates*, National Institute on Drug Abuse, National Institutes of Health, https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (last visited: April 2, 2024).



Figure 3. National Overdose Deaths Involving Any Opioid*, Number Among All Ages, by Gender, 1999-2021

Moreover, the defendant himself had personally experienced the dangers of fentanyl, having reported that he believes he experienced an overdose the *first time* that he consumed a fentanyl pill. *See* PSR ¶ 73. While the defendant claims he wasn't aware the pills contained fentanyl until after decedent-1's death, that's not plausible, and at a minimum the defendant's experiences reinforced that the pills he distributed were extremely dangerous. There can be no doubt that the defendant understood the dangers of fentanyl perfectly well, either because of current events or his own experiences or a general understanding among drug users, and yet he was not deterred.

Worse, the defendant's continuous drug distribution made an outcome like this a statistical inevitability. The defendant isn't simply unlucky—somehow who happens to have distributed pills to someone who happens to have overdosed. The defendant distributed enough pills to enough at-risk individuals that an overdose was bound to happen. Nor was the defendant deterred by the overdose in this case. After the death in this case, he could have chosen to stop. But he didn't.

The defendant was undoubtedly an addict and he is undoubtedly a small part of a much broader fentanyl problem. The Court shouldn't ignore other contributing elements of the nation's fentanyl problem, including the supply of fentanyl from China, the illegal manufacturing and trafficking of fentanyl pills by international drug cartels, and sociological trends that contribute to demand for fentanyl in the United States. But those factors don't negate the defendant's

choices, and the defendant remains legally and morally responsible for his actions, which have had terrible consequences on those around him. As a result, based on the nature and circumstances of the defendant's conduct, the need for the sentence to reflect the seriousness of the offense, and the need to deter the defendant and others, the United States respectfully submits that a 120-month sentence is appropriate.

## CONCLUSION

For the reasons stated above, the United States respectfully submits that a sentence of 120 is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:      /s/_____
Philip Alito
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone:    703-299-3700
Fax:            703-299-3890

10

## CERTIFICATE OF SERVICE

I hereby certify that, on April 2, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which automatically generated a Notice of Electronic Filing to counsel of record in this case.

/s/
Philip Alito
Assistant United States Attorney